IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| M&I MARSHALL & ILSLEY BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 10-0627-CV-W-SOW |
| | ) | |
| SUNRISE FARMS DEVELOPMENT, LLC | ) | |
| f/k/a RAUSCH COLEMAN CRAY, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Before the Court is plaintiff BMO Harris Bank, N.A., successor by merger to M&I Marshall & Ilsley Bank's Motion for Summary Judgment (Doc. #84), defendants' Suggestions in Opposition (Doc. #86), and plaintiff's Reply (Doc. #89). For the reasons stated below, plaintiff's motion is granted in part and denied in part.

I. Background[1]

**A. The Construction Loan Agreements and Promissory Notes**

Between April 2005 and February 2009, M&I Marshall & Ilsley Bank (the "Bank"), entered

---

[1] Although defendants filed suggestions in opposition to plaintiff's motion that included a list of material facts to which they assert a genuine issue exists, defendants did not cite to the record in their statement of facts. Pursuant to Local Rule 56.1(a), "the suggestions in opposition to a motion for summary judgment shall begin with a section that contains a concise listing of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be set forth in a separate paragraph, shall refer specifically to those portions of the record upon which the opposing party relies, and if applicable, shall state the paragraph number in movant's listing of facts that is disputed." Defendants have failed to properly controvert any of plaintiff's statement of uncontroverted facts. Accordingly, the facts set forth herein are repeated almost verbatim from plaintiff's motion for summary judgment and suggestions in support. See Schnare v. UNUM Life Ins. Co. of Am., No. 07-0910-CV-W-FJG, 2009 WL 3531768, at *1 n.1 (W.D. Mo. Oct. 27, 2009).

into a series of loan transactions with the defendants to finance developing commercial and residential property located in Grandview, Missouri. To this end, on April 5, 2005, and in consideration of certain loans made by the Bank, Rausch Coleman Cray LLC ("Sunrise Farms")[2] and the Bank executed a Construction Loan Agreement containing terms and conditions that were to govern the Bank's agreement to lend money to Sunrise Farms. On December 30, 2005, and in consideration of certain loans made by the Bank, Sunrise Farms and the Bank executed a Development Loan Agreement ("DLA") containing the terms and conditions governing the Bank's agreement to lend money to Sunrise Farms. On June 30, 2007, the Bank and Sunrise Farms amended the DLA and executed Amendment No. 1, and then on October 1, 2007, the Bank and Sunrise Farms amended the DLA and executed Amendment No. 2. Under the DLA, the Bank agreed to loan Sunrise Farms funds "for the purpose of developing/constructing certain improvements on the real property as set forth in the DLA." Upon default of Sunrise Farms' obligations in the DLA, the Bank was "entitled . . . to: (d) foreclose the Mortgage and exercise any other rights or remedies under the Loan Documents."

On October 17, 2007, the Bank and Sunrise Farms executed two Construction Loan Agreements ("CLA") establishing the terms and conditions of the Bank's agreement to lend money to Sunrise Farms.

The 2005 loan transactions between the Bank and Sunrise Farms were replaced by promissory notes executed in 2009. The promissory notes include:

---

[2] In the summer of 2009, Rausch Coleman Cray, LLC changed its name to Sunrise Farms Development, LLC.

(1) January 1, 2009, in exchange for renewal of existing debt evidenced by a Promissory Note dated April 5, 2005, Sunrise Farms executed a Promissory Note in favor of the Bank in the principal amount of $2,711,250;

(2) On January 17, 2009, in exchange for renewal of existing debt evidenced by a Promissory Note dated October 17, 2007, Sunrise Farms executed a Promissory Note in favor of the Bank in the principal amount of $990,000;

(3) On January 17, 2009, in exchange for renewal of existing debt evidenced by a Promissory Note dated October 17, 2007, the Borrower executed a Promissory Note in favor of the Bank in the principal amount of $2,576,150;

(4) On February 20, 2009, in exchange for credit and financial accommodations by the Bank, Sunrise Farms executed a Promissory Note in favor of the Bank in the principal amount of $700,000.

Each promissory note stipulated to being "governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri." The Notes matured on May 31, 2009.

**B. The Guaranties**

In consideration for the loans to Sunrise Farms, defendants Ernest Coleman ("Coleman") and Daniel Whitney ("Whitney") each executed a personal guaranty promising to guarantee Sunrise Farm's payment and performance obligations under the Notes. In consideration for the Bank to enter into the loan relationship and to induce the Bank to extend credit to Sunrise Farms, Coleman executed a personal guaranty promising to pay the present and future indebtedness of Sunrise Farms to the Bank up to the amount of $1,800,000 ("April 2005 Coleman Guaranty"). Furthermore, in consideration of the Bank's agreement to forbear with respect to collection of the debt and to induce the Bank to extend to and/or maintain credit with Sunrise Farms, Whitney executed a personal guaranty promising to pay the present and future indebtedness of Sunrise Farms to the Bank up to the amount of $932,850 ("Whitney Guaranty"). The Whitney Guaranty states: "I agree to waive

reliance on any anti-deficiency statutes, through subrogation or otherwise, and such statutes in no way affect or impair my liability." Coleman also executed a personal guaranty on December 30, 2005, promising to pay the present and future indebtedness of Sunrise Farms to the Bank up to the amount of $3,731,400 ("December 2005 Coleman Guaranty"). Both the April 2005 Coleman Guaranty and the December 2005 Coleman Guarantee state: "I agree to waive reliance on any anti-deficiency statutes, through subrogation or otherwise, and such statutes in no way affect or impair my liability."

On October 1, 2007, Coleman and Whitney each executed Commercial Guaranties ("CGs") agreeing absolutely and unconditionally to make full and punctual payment and satisfaction of Sunrise Farm's indebtedness to the Bank. Both CGs provide: "Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any 'one action' or 'anti-deficiency' law or any other law which may prevent Lender from bringing action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale."

On July 20, 2009, Byars & 150 Enterprises, the Maddock Group L.L.C., and Family Land Investors LLC (collectively referred to as the "LLC Guarantors") executed unlimited continuing guaranties (the "LLC Guaranty") in consideration of good and valuable consideration given by the Bank to Sunrise Farms and the LLC Guarantors in order for the Bank to enter into a forbearance agreement. As part of the LLC Guaranty, the LLC Guarantors acknowledged the receipt of good and valuable consideration given by the Bank. Garry Maddock, representative of the Maddock Group, testified that the purpose of the LLC Guaranty was so that the Bank would enter into the

-4-

forbearance agreement. It is undisputed that the Individual Guaranties (i.e., the Coleman and Whitney Guaranties) and the Commercial Guaranties are governed by Kansas law. All of the Guaranties were delivered unconditionally to the Bank.

**C. Forbearance Agreement**

By June 1, 2009, Sunrise Farms defaulted under the terms of the Notes. On June 30, 2009, the Bank initiated a lawsuit against Sunrise Farms and the Individual Guarantors in Jackson County, Missouri. In consideration of the Bank's agreement to forbear in the exercise of its remedies against Sunrise Farms, the Individual Guarantors and the LLC Guarantors for a limited period of time and to dismiss the lawsuit, Sunrise Farms, the Individual Guarantors and the LLC Guarantors entered into a forbearance agreement. As part of the forbearance agreement, Sunrise Farms acknowledged that the Notes and other loan documents were unchanged and remained in full force and effect. Pursuant to the forbearance agreement, the forbearance period expired on January 20, 2010.

**D. Defaults**

The Bank is currently the owner and holder of the Loan Documents. Sunrise Farms has been in default for a substantial period of time for, among other things, failing to pay the balance due under the Notes. On April 26, 2010, the Bank provided notice of default to all defendants and made demand that the Notes be paid in full and, if defendants refused, the Bank would exercise any and all rights pursuant to the Loan Documents. All the defendants failed to make payments under their obligations to the Loans.

**E. Foreclosure Sale**

As security for the Loans, Sunrise Farms granted a Deed of Trust in favor of the Bank with respect to the property. For default in the payment of the debt and performance of obligations

secured by a deed of trust executed by Rausch Coleman Cray, LLC, the successor trustee set a Trustee's Sale for the sale of the property to the highest bidder for cash for July 27, 2010. Beginning July 7, 2010 and continuing for twenty-one consecutive days through July 27, 2010, a notice of Trustee's Sale was published in The Kansas City Daily Record.

On July 23, 2010, defendants moved the Court for a mandatory injunction, seeking to enjoin the Bank from "making the above-mentioned non-judicial foreclosure sale on July 27, 2010 without bidding in 100% of the amount owed on the notes sued on so that a deficiency of any kind will exist against the guarantors." The Court ordered the trustee's foreclosure sale continued for one week. On the originally set date for the sale, July 27, 2010, an announcement was made by the Trustee that the Foreclosure Sale was continued to August 3, 2010.

When the announcement continuing the sale was made, no interested bidders were present. The Trustee sold the property on August 3, 2010 for the sum of $3,726,834 to M&I Regional Properties, LLC, assignee and affiliate of M&I Marshall & Ilsley Bank. The bid submitted at the foreclosure sale was formulated after the Bank obtained an appraisal for the property and considered other factors, including taxes, marketing time, and carrying expenses. After applying credits due to Sunrise Farms, as of August 1, 2011, the outstanding amounts due under the Loan Documents is principal of $2,475,214.25, accrued interest of $162,102.65, plus accruing per diem interest at current rate of $442.45, plus costs and attorneys' fees, including but not limited to post-judgment interest at the highest rate allowed under the Loan Documents. The Bank has also incurred $88,899.89 in fees and expenses that have been billed through June 30, 2011. Moreover, the Bank has incurred $19,751.95 in fees and expenses in July 2011, which have not been billed yet.

**F. Procedural Posture**

On June 21, 2010, the Bank filed this action seeking recovery (1) against Sunrise Farms on the Notes, (2) against the Individual Guarantors on the Individual Guaranties and the Commercial Guaranties, and (3) against the LLC Guarantors on the LLC Guaranty. Defendants engaged James E. Summers to provide a Market Value Estimate of 242.48 acres of portions of Sunrise Farms as of March 2010. Mr. Summers', engaged by defendants to provide a Market Value Estimate, opined that the fair market value of the property is $6,050,000.

On December 20, 2011, the Court stayed this case pending a decision by the Missouri Supreme Court in the case of First Bank v. Fischer & Frichtel, Inc. (*see* Doc. #90). The parties informed the Court of the Supreme Court's decision on May 8, 2012.

II. Standard

A motion for summary judgment should be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Rafos v. Outboard Marine Corp., 1 F.3d 707, 708 (8th Cir. 1993) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). In reviewing a motion for summary judgment, the Court must scrutinize the evidence in the light most favorable to the non-moving party, according the non-moving party the benefit of every factual inference and resolving any doubts as to the facts or existence of any material fact against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The moving party bears the burden of presenting sufficient evidence to establish that there are no genuine issues of material fact for trial and that the movant is entitled to summary judgment as a matter of law. Celotex, 477 U.S. at 323. "A fact is 'material' if it might affect the outcome of the case and a factual dispute is 'genuine' if the evidence is such that a reasonable jury

could return a verdict for the non-moving party." Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co., 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004) (citation and internal quotations omitted).

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A party opposing a properly supported motion for summary judgment may not rest upon the allegations contained in the pleadings, "but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 526-27 (8th Cir. 2007).

III. Discussion

**A. The Loan Documents Entitle the Bank to Summary Judgment Against Sunrise Farms**

The Loan Documents are governed by Missouri law. The parties are in accord that in order for the Bank to recover on a promissory note, the Bank must show: (1) Sunrise Farms executed the promissory note; (2) Sunrise Farms defaulted under the promissory note; (3) the Bank demanded payment of the promissory note; and (4) the Bank suffered damages as a result of Sunrise Farm's default. See Pathway Fin. v. Schade, 793 S.W.2d 464, 468 (Mo. Ct. App. 1990). The facts on this issue are not disputed: Sunrise Farms executed the Notes, Sunrise Farms defaulted under the Notes, the Bank demanded payment. However, Sunrise Farms argues that the Bank "did not suffer damages, or as severe damages as they claim, as a result of this default."

-8-

Sunrise Farms argues that the Bank did not suffer any damage because it has possession of the property and the Bank will realize a "windfall of a at least $2,323,166[3] if allowed to recover their claimed deficiency." Sunrise Farms concedes that it has no legal arguments to support its theory; instead, it argues that it is "aware that the banking industry often bids far below the fair market value to obtain foreclosure properties and receive a windfall when they are ousting borrowers from their property." Sunrise Farms states that they are challenging this type of behavior. Moreover, after the Supreme Court decided the First Bank case, Sunrise Farms has advocated for the position taken by Justice Teitelman in his dissenting opinion.

As it relates to the elements of the cause of action against Sunrise Farms, the Court finds that the Bank is entitled to summary judgment. However, as discussed below, the Court is of the view that the amount of the deficiency owed by Sunrise Farms should be measured by the difference between the amount of the unpaid debt and the fair market value of the property at the time of the foreclosure sale.

**B. Counts II and III**

Next the Bank contends that it is entitled to summary judgment on Counts II and III – for default on the guaranties by the Individual Guarantors and LLC Guarantors. It is undisputed that Kansas law governs the Individual Guaranties and the Commercial Guaranties, while Missouri law governs the LLC Guaranties. Under both Missouri and Kansas law, to recover on a contract of guaranty, the lender must show: (1) the guarantor executed the guaranty; (2) the guarantor unconditionally delivered the guaranty to the lender; (3) the lender thereafter extended credit to the

---

[3] As stated above, Mr. Summers opined that $6,050,000.00 represents the market value estimate.

borrower in reliance on the guaranty; and (4) the borrower owes the creditor a sum of money which the guaranty purports to cover. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 382 (Mo. 1993) (en banc) (citing Linwood State Bank v. Lientz, 413 S.W.2d 248, 256 (Mo. 1967)); see Stokers v. Roth, 887 F.Supp. 265, 268 (D. Kan. 1995) (citing Wagnon v. Slawson Exploration Co., 874 P.2d 659 (Kan. 1994)).

Again, defendants do not contest that the Bank can meet each of these elements. Defendants do dispute the amount of indebtedness the Bank claims under the Guaranties, however. Defendants rely on Kansas law for their proposition that a material issue of fact remains as to the fair value of the property. Specifically, defendants argue that under Kan. Stat. Ann. § 60-2415, this Court has discretion to determine the "fair value" of the property. See Olathe Bank v. Mann, 845 P.2d 639, 646 (1993).

Defendants' contention that Kansas law applies to this issue is incorrect. Defendants have improperly applied a Kansas foreclosure statute to a Missouri foreclosure, without any explanation as to why Kansas law would apply. Because the foreclosure took place in Missouri, Missouri law applies to evaluate the foreclosure. See Resolution Trust Corp. v. Atchity, 913 P.2d 162, 172 (Kan. 1996) (observing that the general rule is that a foreclosure of a mortgage must be done pursuant to the procedural law of the state where the property is located); see Mueller v. Simmons, 634 S.W.2d 533, 536 (Mo. Ct. App. 1982) (citing Mo. Rev. Stat. § 443.310). The Notes are the contracts under which the amount due is calculated – the guaranties are simply a personal promise of payment and performance under the Notes.

The Court finds that the Bank is entitled to summary judgment on Counts II and III, but the Court, as stated above, believes the amount of the deficiency owed by defendants should be

-10-

measured by the difference between the amount of the unpaid debt and the fair market value of the property at the time of the foreclosure sale.

**C. Amount of Indebtedness**

The main issue in this case is the amount of indebtedness owed under the Notes, which is why the Court stayed the resolution of this issue pending the Missouri Supreme Court's decision in First Bank v. Fischer & Frichtel, Inc., No. SC 91951, 2012 WL 1339437 (Mo. 2012) (en banc).

Prior to First Bank, the longstanding rule in Missouri as to the measure of deficiency in a suit on a Note following a foreclosure was based on the sum for which the property was sold and not on the property's fair market value. Id.; Lindell Trust Co. v. Lieberman, 824 358 (Mo. Ct. App. 1992) ("[T]he law in Missouri is that '[a]s long as the [foreclosure] sale stands, the sum for which the property sold has been held conclusive for the purpose of determining the amount of deficiency.'"); see Drannek Realty Co. v. Nathan Frank, Inc., 139 S.W.2d 926 (Mo. 1940); Mo. Rev. Stat. § 443.240.

In First Bank, the borrower, Fischer & Frichtel ("F&F"), was a real-estate developer with more than sixty years of experience in the real-estate industry. Indeed, from 2005 to the beginning of 2008, F&F had hundreds of millions of dollars in revenue and earned tens of millions in profits. In June 2000, F&F borrowed $2.576 million from First Bank for the purchase of 21 lots in Franklin County, Missouri for a residential development. F&F executed a promissory note secured by a deed of trust pledging the lots as collateral. For five years, F&F made payments on the loan and sold 12 of the 21 lots to prospective home buyers. Although the parties negotiated and extended the maturity date on the loan multiple times, First Bank was eventually forced to demand payment and file a petition seeking judgment for the remaining amount due on the note, interest, attorney fees,

-11-

and costs. When F&F defaulted on the loan, First Bank foreclosed on the remaining lots that were subject to the deed of trust. The foreclosure proceedings took place in December 2008, and First Bank acquired the lots after making the only bid of $466,000.

At trial, F&F presented expert testimony that the fair market value of the nine lots at the time of the foreclosure was nearly double what First Bank paid, $918,000. The trial court submitted an instruction to the jury that allowed them to consider the balance due on the loan, "less the fair market value of the property at the time of the foreclosure sale, plus interest." Consequently, the jury found the fair market value of the lots was $918,000, and thus, F&F owed First Bank $215,875. Both parties filed post-trial motions, with First Bank arguing for a new trial on the grounds that the trial court erred in submitting a damage instruction that was contrary to Missouri law "because it directed the jury to base the amount of the deficiency on the fair market value of the property at the time of the foreclosure sale instead of on the amount obtained at the foreclosure sale."

F&F conceded that the law in Missouri under Drannek was binding, but nevertheless asked the appellate court to adopt the Restatement (Third) of Property: Mortgages § 8.4, which governs actions for a deficiency following a foreclosure. The appellate court acknowledged that the law in Missouri was well-established, but concluded that transfer of the case to the Missouri Supreme Court was appropriate because the case presented issues of general interest and importance, and for the purpose of re-examining the law. First Bank v. Fischer & Frichtel, Inc., No. ED 95297, 2011 WL 3558118 (Mo. Ct. App. Aug. 9, 2011).

The Missouri Supreme Court accepted transfer and affirmed the trial court's grant of a new trial to First Bank. F&F asked the Missouri Supreme Court to overrule Missouri's common law approach to measuring deficiency judgments and adopt the Restatement (Third) of Property fair

-12-

value calculation method, which limits the amount of the lender's deficiency damages to the difference between the fair market value and the amount due on the note. First Bank, 2012 WL 1339437, at *4.

The Missouri Supreme Court started by noting that there are two general approaches to reviewing claims that the amount received for a property at a foreclosure sale is insufficient. As it pertains to Missouri, the Missouri Supreme Court noted

> Missouri and many of the other states in which the method of measuring deficiencies is governed by the common law traditionally have followed a different approach[ ]. These states require a debtor to pay as a deficiency the *full difference between the debt and the foreclosure price. They do not permit a debtor to attack the sufficiency of the foreclosure sale price as part of the deficiency proceeding even if the debtor believes that the foreclosure sale price was inadequate.*

Id. at *3 (internal footnote omitted) (emphasis in original altered). The Missouri Supreme Court further explained that this does not leave

> a [Missouri] debtor [without] a mechanism for attack[ing] an inadequate foreclosure sale price. Rather, a debtor who believes that the foreclosure sale price was inadequate can bring an action to void the *foreclosure sale* itself. If the sale stands, then it has been thought fair to require the debtor to pay any deficiency remaining based on the foreclosure sale price.

Id. at *4 (internal citations omitted).

The Missouri Supreme Court noted that F&F did not offer any reasons as to why it failed to file an action attacking the validity of the foreclosure sale due to the inadequacy of the foreclosure sale – even though F&F apparently could have bid at the foreclosure sale, and further, could have obtained alternative financing as it was a sophisticated company with sufficient assets. Id. Instead, F&F argued that the standard in Missouri for setting aside a foreclosure sale is so high that it would be virtually impossible to realistically meet such an onerous standard. Id. Further, F&F argued the foreclosure process is unfair partly because cash must be offered for the property and that ordinary

-13-

bidders would suffer because of the statutory minimum time period between notice of foreclosure and the actual sale. Id. at *5.

In response to these arguments, the Missouri Supreme Court found that F&F was really alleging concerns, not about the fairness of the deficiency determination itself but, rather, about the fairness of the foreclosure sale price due to lack of sufficient notice to obtain financing or other bidders. Id. The Missouri Supreme Court ultimately rejected F&F's arguments and stated that "as the record shows, [F&F] simply made a strategic choice not to bid, not to attack the amount received as inadequate under the traditional standard for setting aside a foreclosure sale and not to ask this Court to adopt a less onerous standard." Id. at *6. Thus, because F&F had sufficient means to attack the underlying foreclosure sale price as inadequate, it would not be permitted to collaterally attack the foreclosure amount in the deficiency action.

The Missouri Supreme Court also touched on the public policy concerns surrounding states using the fair market value approach as opposed to the common law approach. Id. at *5. The Missouri Supreme Court noted that, in all the cited cases that follow the fair market value approach, all have done so based on statute or because they have always done so. Id. at *6.[4] In the end, however, the Court found that the public policy reasons "that form[ed] the basis of F&F's argument for modification of the more than century-old practice of using the foreclosure sale price [has] no application to a sophisticated debtor such as it." Id. Consequently, the Missouri Supreme Court

---

[4] The Court notes that the Missouri Supreme Court's decision does not explicitly find that such a decision should be made by the legislature. The Missouri Supreme Court merely noted that many of the states that have been presented with the issue have dealt with it by statute, rather than common law. In the end, the Missouri Supreme Court clearly found that since F&F was making arguments that concerned the fairness of the foreclosure sale price, and not the fairness of the deficiency determination itself, that this was not a case to consider modifying Missouri law.

-14-

concluded that this was not a case "in which to consider a modification of the standard for setting aside a foreclosure sale solely due to inadequacy of price *or* whether a change should be made in the manner of determining a deficiency where the foreclosure price is less than the fair market." Id. (emphasis added).

As the Court interprets this case, the Missouri Supreme Court seems more than willing to re-examine the strict standard for voiding a foreclosure sale based upon an inadequate sale price. The Missouri Supreme Court also seems willing to adopt some form of the Restatement approach in measuring deficiencies. As this case is a diversity action, the Court must apply Missouri law as declared by the Supreme Court of Missouri. E.g., Council Tower Ass'n v. Axis Specialty Ins. Co., 630 F.3d 725, 728 (8th Cir. 2011) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). Ordinarily, if the state's highest court has announced a rule, this Court is bound to follow it. But if the Court finds clear evidence that the state's highest court would not uphold the prior decision, the Court is not required to follow it in this case. E.g., Gilstrap v. Amtrak, 998 F.2d 559, 561 (8th Cir. 1993) ("if we find clear evidence that the [state] Supreme Court would not uphold [the prior decision], we shall not apply it to this case."). This Court concludes that, if the Missouri Supreme Court were to address the issue today with the right case, it would follow the Restatement approach for valuing the deficiency amount.

As Justice Teitelman saw no reason to wait for the legislature to institute this change in measuring deficiencies, see id. at * 8, this Court, too, can think of no rationale for prolonging the inevitable. Indeed, the fact that so many states have chosen to adopt some form of the Restatement approach is evidence in and of itself that Missouri will soon make some form of change to the existing law and move toward the fair market valuation. Thus, the Court finds that it should value

-15-

the amount of indebtedness in this case by the fair market value of the property against the amount due under the Note.[5]

On the present record, though, the Court is unable to determine the fair market value of the property. The Court is aware that defendants have submitted a fair market value price of $6,050,000. The Court is unable to discern the Bank's fair market value estimation. Thus, the Court would like briefing on this issue from the Bank. The Bank should provide briefing that includes its fair market valuation of the property.

## IV. Conclusion

Accordingly, it is hereby

ORDERED that plaintiff BMO Harris Bank, N.A., successor by merger to M&I Marshall & Ilsley Bank's Motion for Summary Judgment (Doc. #84) is granted in part and denied in part. It is further

ORDERED that within thirty (30) days of the date of this Order the Bank shall provide its fair market estimation of the property.

      /s/ Scott O. Wright
     SCOTT O. WRIGHT
     Senior United States District Judge

DATED: June 28, 2012

---

[5] The Bank also argues that the Guarantors expressly waived any anti-deficiency defense. The Court disagrees.

-16-

Case 4:10-cv-00627-SOW   Document 93   Filed 06/28/12   Page 16 of 16